IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                           Criminal Case No. 3:14CR80

ANTONIO JOHNSON,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the Defendant's MOTION TO SUPPRESS (Docket No. 15). For the reasons set forth herein, the MOTION TO SUPPRESS is denied.

## PROCEDURAL BACKGROUND

The Defendant, Antonio Johnson ("Johnson") was indicted on June 17, 2014 on two counts. Count One charges Johnson with Possession with Intent to Distribute Cocaine Hydrochloride, in violation of 21 U.S.C. § 841; and Count Two charges Johnson with Possession of a Firearm and Ammunition by a Convicted Felon. (Docket No. 11.)

Johnson filed the MOTION TO SUPPRESS (Docket No. 15) seeking to suppress the items (a .45 caliber handgun, a clip with approximately 13 bullets, and 43 grams of cocaine) retrieved by the police ensuing Johnson's arrest and statements that he made to the police. The Government filed its response

and Johnson replied.   On July 30 and 31, 2014, the Court heard evidence on the motion.   Thereafter, supplemental briefing was ordered, and a transcript of the hearing was prepared and filed. See Orders of July 15 and July 29, 2014 (Docket Nos. 33 and 36). The parties have filed the supplemental briefs, and the motion is ripe.

## FINDINGS OF FACT

At approximately 11:10 p.m. on February 19, 2014, Johnson was driving a blue Volvo east on Venable Street, in Richmond, Virginia, when he slowed at a stop sign at the intersection of Venable and Jessamine Streets.   On one corner of that intersection was a house known for drug distribution. Hrg. Tr. 14-18; 71-72; Def. Ex. 7A-7C.   At the same time, a marked police car was traveling west on Venable Street, also at the intersection of Venable and Jessamine.   Four officers were in the police car.   They were Officers Gilbert, Moore, Gaines, and Parker. Hrg. Tr. 126.   All four were members of the so-called "Focus Mission Team," a group of officers assigned to patrol a specified precinct and to respond to dangerous situations and problems that arise in that precinct.   The officers wore standard uniforms which consisted of cargo pants, a tee shirt, and a ballistic vest with the word "police" on it.   The officers also wore holstered handguns. Hrg. Tr. 13-18.

As the officers crossed the intersection, they passed Johnson in the Volvo, which was stopped at the intersection. Johnson did not look in their direction and was slouched down in his seat. Officer Gilbert had the impression that Johnson tried to hide by moving his head behind a pillar that separated the front and rear doors of the Volvo. However, evidence showed that there was no door pillar in that car. Def. Ex. 7B; Hrg. Tr. 18-19.

Unable to follow Johnson without making a U-turn, the officers squared the block, turning from Venable Street right onto North 22nd Street, then right onto Carrington Street, and then right on Jessamine Street, which runs into North 23rd Street at an angle in about three blocks. During that period, the officers could not see the Volvo. After squaring the block, the officers caught sight of the Volvo several minutes later when they saw it about a half a block in front of them at a stop sign on North 23rd Street and Jefferson Avenue. The officers did not activate the overhead or emergency lights on the police car as they followed about half a block behind Johnson on North 23rd Street. Hrg. Tr. 20-27; 102-05. Johnson turned left onto Clay Street, and then made an abrupt left turn into the rear parking lot of the Jefferson Mews townhomes located in the 500 block of North 23rd Street, cutting across the exit lane of the parking lot entrance. Hrg. Tr. 27-37. Although there were no

3

markings on that entrance and the officers did not conduct a traffic stop on that basis, Officer Gilbert explained that Johnson's conduct was a traffic infraction within the meaning of Va. Code § 46.2-852. Hrg. Tr. 93-96.

The parking lot is located between two sets of townhomes, with an island or median in the center of the parking lot and parking spaces delineated on both sides of the median. There are two entrances into the parking lot; one from Clay Street and the other from Jefferson Avenue. The widest part of the entrance on Clay Street, where Johnson turned, is 35 feet, and the narrowest part is 19 feet wide. The parking spaces are grouped in pairs, with a grassy peninsula jutting out between every pair of parking spaces. The distance between the tip of the grassy peninsula and the median that is located in the center of the parking lot is approximately 19 feet, 9 inches. The distance between the rear of the vehicle pictured in Def. Ex. 4D,[1] parked in the parking space beside where the Volvo was parked, and the median is approximately 25 feet. The police vehicle was a Ford Crown Victoria, which measures approximately 73 inches wide. A 2001 Volvo such as the one that Johnson drove is 185.7 inches (15 feet and 5.7 inches) in length. There was some lighting

---

[1] The pictures were taken by counsel for Johnson long after the events at issue for the purpose of depicting the parking area where the Volvo was parked. The vehicle in the picture was represented to be approximately the same size as the Volvo.

near the far end of parking lot, but the lot was not well-lit. Hrg. Tr. 256-58; 263-64; 283-85; 294; 296-97; Govt. Exs. 4A-4B; Def. Exs. 4A-4E, 13A-13C.

After executing the abrupt turn into the Jefferson Mews parking lot, Johnson drove the Volvo into the first space of the second pair of parking spots (immediately next to the grassy peninsula and the trash can pictured in Govt. Exs. 5B-5C and Def. Exs. 4C-4E). He then exited the Volvo, and walked away from it with no indication that he had seen the police car that had entered the lot behind him. Gilbert, but none of the other officers, recalled that Johnson appeared to be talking with someone on his cell phone as he walked. All four officers testified that Johnson exited the Volvo quickly and immediately thereafter started walking away from the Volvo and toward the townhomes. Hrg. Tr. 37-40; 129; 151; 177.

Gilbert parked the police car adjacent to the curb at the end of the grassy peninsula that was beside the parking spot where Johnson parked. The police car was not immediately behind the Volvo and was not blocking it. The front of the police car was three to five feet distant from the back of the Volvo. See Govt. Ex. 5B; Hrg. Tr. 128. The police car's headlights remained on but no other lights on the police car were activated. Hrg. Tr. 39, 89, 129.

The defense sought to show that the Volvo's route of egress was blocked by offering the testimony of Ms. Johnita Abrams, who lived in the townhome to which Johnson was headed. Abrams testified that, when she looked out her back door through partially opened blinds, the police car was parked directly behind the vehicle that turned out to be the Volvo. Hrg. Tr. 211-13. But Abrams' angle for viewing the parking lot was not conducive to a valid observation. Moreover, the evidence about subsequent parts of the encounter make it likely that Abrams' observation did not take place during the initial encounter with Johnson but, instead, later when the police returned to the parking lot to search the Volvo. For these reasons, the Court does not credit her testimony. Hrg. Tr. 226-30; 345-49.

Initially, all of the officers remained in the car, and no weapons were drawn. Gilbert rolled down his window and began a conversation with Johnson by asking him if he was "okay," to which Johnson replied "yes." Gilbert then inquired whether his driver's license was "okay." Johnson replied "yes," but said that he did not have it with him, thus admitting to committing the traffic offense of driving without a license. Hrg. Tr. 37-40; 129-30; 151-53; 178. See Va. Code Ann. § 46.2-104. As was shown shortly thereafter, Johnson's statement was untrue. In fact, his license was suspended so he did not have a valid license, but the officers did not yet know that fact. Johnson

6

also stated that his license was in one of the apartments, pointing to an apartment nearby; but, when asked the number of the apartment, he replied that he did not know the number of the apartment. Hrg. Tr. 40-41; 130; 178.

In response to Johnson's statement that he did not have his license with him, Officer Gilbert, who was still in the police car talking to Johnson through the rolled-down window, told Johnson that he could just "run his numbers on the computer" (referring to a driver's license number or a social security number), so Johnson gave Gilbert a social security number, which was entered in the computer system by Officer Parker who was in the front seat with Gilbert. Johnson also told Gilbert that his name was "Ronald Bullock." Hrg. Tr. 41-42; 130; 178.

The computer check on the name and social security number given by Johnson disclosed that neither was valid. So, Officer Gilbert asked Johnson again for his social security number, and Johnson provided a different number, thereupon creating probable cause to believe that Johnson originally had given false information to the officers. That too is an offense under Va. Code Ann. § 18.2-186.3, which states in pertinent part that "[i]t shall be unlawful for any person to use identification documents or identifying information of another person, whether that person is dead or alive, or of a false or fictitious

7

person, to void summons, arrest, prosecution, or to impede a criminal investigation."

About this time, Officer Gaines exited the back seat of the car, followed by Officer Moore. There is a dispute of sorts about when Gaines and Moore exited the police cruiser. Gaines's Report, Def. Ex. 3 and Govt. Ex. 17, written immediately after the arrest of Johnson, states that Gaines and Moore left the police car "as Officer Gilbert continued to have a conversation from within the vehicle with the male [Johnson]" and then describes Johnson providing the first social security number and the name of Ronald Bullock. Gaines's testimony was consistent with the report. Gilbert could not recall precisely when they exited the vehicle, but he testified that Gaines and Moore were still in the vehicle when Johnson admitted that he did not have a driver's license. Hrg. Tr. at 42. Moore's testimony teaches that he and Gaines exited after the first social security number and name could not be verified, and Parker's testimony is consistent with that.

Johnson notes that Gaines's report recites exiting the police car in one sentence and hearing Johnson give a false name and social security number in the next sentence. From that, Johnson concludes that the order of the sentences defines the sequence of events. However, the fact that Gaines's report recites events in two different sentences does not mean that the

8

recited events occurred in the order that they are recited. And, viewing the record as a whole, the Court finds that Officers Gaines and Moore exited the police car after Johnson admitted that he was not in possession of his driver's license and while he was talking to Gilbert about his social security number and name. In addition, although the defense questions whether Johnson admitted that he was not in possession of his driver's license, if Johnson had been in possession of his license, he could have handed it to Gilbert for inspection, and Gilbert would have had no reason to offer to run the numbers instead. Hence, the evidence and the reasonable inference therefrom disprove Johnson's contention.

Both Gaines and Moore walked onto the grassy peninsula where Johnson was standing. Neither officer drew his weapon or touched Johnson, and they stood approximately three to four feet away from Johnson and at a 45 degree angle. Officer Gaines then began a conversation with Johnson, asking him who he was visiting and whose vehicle he was driving. Johnson responded that he was visiting his aunt and that he was driving his girlfriend's vehicle. As Gaines walked beside the Volvo that Johnson had been driving, Gaines had noticed an open container of alcohol in the car, another violation of Virginia law, and Gaines asked Johnson about the open container of alcohol as well. Johnson responded that he had just opened it and that

there was nothing else illegal in the car.  Hrg. Tr. 43-44; 129-137; 152-53; 180.

Each of the officers described Johnson's behavior as nervous when he was providing identifying information to Gilbert.  Hrg. Tr. 45-46; 130-33; 153-54; 178.  As Officers Gilbert and Parker, both of whom were still in the police car, were checking the identifying information from Johnson on the computer, Gaines jokingly asked Johnson which way he was going to run. Hrg. Tr. 154.

When Gilbert told Johnson that the second social security number could not be verified as valid either, Johnson exclaimed, "F--- it, y'all gonna have to catch me."  He ran, and Officers Gaines, Moore and Parker pursued Johnson on foot.  Hrg. Tr. 4; 136-37; 154.

Just before he was apprehended, Johnson threw away a loaded .45 caliber magazine onto a nearby porch, which the officers retrieved. Hrg. Tr. 48-49; 139-40; 155; Govt. Ex. 9.  The officers conducted a search of Johnson incident to arrest, and they found a plastic bag with approximately 43 grams of cocaine in Johnson's pocket and a false identification document that appeared to be a Delaware driver's license. Hrg. Tr. 50; 155; Govt. Exs. 10 & 17.

Officers Moore and Gaines returned to the Volvo while the other officers took Johnson to the precinct for processing.

They inventoried the contents of the Volvo and found a loaded .45 caliber handgun that matched the magazine that was found and a small amount of heroin. Hrg. Tr. 140; 155-56; Govt. Exs. 11-13 & 17.

At the precinct station, Johnson provided accurate identification information, and that information, when run through NCIC/VCIN, resulted in the discovery of outstanding warrants for domestic assault, throwing a missile into an occupied vehicle, and two circuit court capiases, as well as Johnson's criminal history. Johnson was read his Miranda rights at 12:08 a.m., and he initially declined to make a statement. After a few minutes, during which the officers did not speak to him, Johnson made incriminating statements about his use of marijuana and cocaine. Hrg. Tr. 156-57; Govt. Ex. 17.

## DISCUSSION

The foregoing facts present the need to decide whether Johnson was seized before he took flight. The legal principles that inform that determination are fairly straightforward.

## I.    The Legal Framework

To begin, the Fourth Amendment to the United States Constitution guarantees that "people are to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV; see also Wolf v.

Colorado, 338 U.S. 25, 27-28 (1949) (holding that the Fourth Amendment is incorporated by the Fourteenth Amendment, and therefore applies to both state and federal government actors).

The protection afforded by the Fourth Amendment is designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." INS v. Delgado, 466 U.S. 210, 215 (1984)(emphasis added)(citing United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). "A central concern in balancing these competing interests [the public interest and the individual's right to personal security free from arbitrary interference by law officers] in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." Brown v. Texas, 443 U.S. 47, 51 (1979).

Evidence that is collected by law enforcement in violation of the Fourth Amendment generally will be excluded from use at trial. See Mapp v. Ohio, 367 U.S. 643, 651-57 (1961); see also Wong Sun v. United States, 371 U.S. 471, 488 (1963) (noting that if evidence is obtained during a violation of the suspect's Fourth Amendment rights (i.e. an "exploitation of that illegality"), then that evidence is a "fruit of the poisonous tree" and may not be used against that defendant) (internal citations omitted).

12

In United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002), the Fourth Circuit described three types of police-citizen encounters that have been recognized by the Supreme Court: (1) arrests, which must be supported by probable cause; (2) brief investigatory stops pursuant to Terry v. Ohio, 392 U.S. 1 (1968), which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place [and] asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." Florida v. Royer, 460 U.S. 497 (1983); accord Florida v. Bostick, 501 U.S. 429, 434 (1991). "[O]fficers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion or justification for their encounters." U.S. v. Burton, 228 F.3d 524, 527 (4th Cir. 2000). "By the same token, the citizen encountered in this manner has the 'right to ignore his interrogator and walk away.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 33 (1968)). "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning

13

resulted in a detention under the Fourth Amendment." Delgado, 466 U.S. at 216.

In Michigan v. Chesternut, 486 U.S. 567 (1998), the Supreme Court recognized that a chase by police officers in a vehicle does not necessarily constitute a seizure of the person. In that case, "the goal of the 'chase' was not to capture respondent, but 'to see where he was going.'" 486 U.S. at 574 n.7. The Supreme Court explained that, "[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of [] presence does not, standing alone, constitute a seizure." Id. at 575. Moreover, "the police conduct here – a brief acceleration to catch up with respondent, followed by a short drive alongside him – was not 'so intimidating' that respondent could reasonably have believed that he was not free to disregard the police presence and go about his business." Id. at 576 (citing Delgado, 466 U.S. at 216). The concurring opinion by Justice Kennedy with whom Justice Scalia joins states, "It is at least plausible to say that whether or not the officers' conduct communicates to a person a reasonable belief that they intend to apprehend him, such conduct does not implicate Fourth Amendment protections until it achieves a restraining effect." Id. at 577.

In Brower v. County of Inyo, 489 U.S. 593, 595-97 (1989), a twenty-mile police chase was presumed not to be a seizure. In

14

California v. Hodari D., 499 U.S. 621, 626 (1991), the Supreme Court held that a police pursuit in attempting to seize a person does not amount to a seizure within the meaning of the Fourth Amendment. It also explained that a seizure requires "either physical force . . . or, where that it absent, submission to the assertion of authority." Id. at 626 (emphasis in original). The Supreme Court also noted that what was not addressed in Chesternut was "the question whether, if the Mendenhall test was met – if the message that the defendant was not free to leave had been conveyed – a Fourth Amendment seizure would have occurred." Id. at 628. In United States v. Holland, 526 F. App'x 305 (4th Cir. 2013), the Court of Appeals held that Holland was not seized, even after the officers followed him on foot from a distance of ten to thirty feet, other officers pulled their marked vehicle to the side of street as the defendant approached that street, and the officers asked the defendant conversational questions.

"[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of

physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." <u>Bostick</u>, 501 U.S. at 434.

> When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart in <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980), who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," <u>id.</u>, at 554 (principal opinion). Later on, the Court adopted Justice Stewart's touchstone, <u>see, e.g.,</u> [California v.] Hodari D., <u>supra</u>, at 627; <u>Michigan v. Chesternut</u>, 486 U.S. 567 (1988); <u>INS v. Delgado</u>, 466 U.S. 210, 215 (1984), but added that when a person "has no desire to leave" for reasons unrelated to the police presence, the "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," <u>Bostick</u>, <u>supra</u>, at 435-436; <u>see also United States v. Drayton</u>, 536 U.S. 194, 202 (2002).

<u>Brendlin v. California</u>, 551 U.S. 249, 255 (2007).

The factors that must be considered include the number of police officers at ·the scene; whether the officers are in uniform; whether the officers display their weapons; whether they touched the defendant or made any attempt to physically block his departure or restrain him; the use of language or tone

of voice indicating that his compliance might be compelled; whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine; and whether, if the officer requested from the defendant some sort of identification, the officer promptly returned it. Mendenhall, 446 U.S. at 554.

The free-to-leave standard is an objective test, not a subjective inquiry. And, "the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." Id. n.6. The uncommunicated intent of the police is irrelevant to a determination of whether a seizure has occurred. Michigan v. Chesternut, 486 U.S. at 574 n.7. In Hodari D., the Supreme Court explained that "Mendenhall establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." Hodari D., 499 U.S. at 628 (describing this as an "objective test"). Bostick clarified that "the 'reasonable person' test presupposes an innocent person." 501 U.S. at 438.

## II. Analysis

Johnson contends that the officers obtained the evidence in this case as the result of the unlawful seizure of his person in violation of the Fourth Amendment.  He frames the issue as "whether the officers' contact with Mr. Johnson was a consensual encounter which does not implicate the Fourth Amendment, or whether, under the totality of the circumstances, the conduct of the police officers amounted to such a show of authority that a reasonable person would not have felt free to leave, resulting in a seizure requiring justification under the Fourth Amendment." Def. Supp. Mem. (Docket No. 34) at 1. Further, the argument continues, because the officers had no reasonable, articulable suspicion that Johnson was involved in any criminal activity, their seizure of him was unlawful.  Thus, he argues, the incriminating items retrieved and the incriminating statements[2] made as a result of the seizure must be suppressed.

Johnson describes the circumstances of the encounter as "generally intimidating," explaining that four armed officers in a marked cruiser approached Johnson, who was alone, "in a small enclosed parking lot, near midnight, and the parking lot was very dark with extremely poor lighting." Def.'s Supp. Mem.

---

[2] Johnson argued initially in his MOTION TO SUPPRESS (Docket No. 15, at 7) that there was no written Miranda waiver.  The United States produced the written Miranda waiver form signed by Johnson (Govt. Ex. 16), and the defense has abandoned this argument.

(Docket No. 34) at 14. The officers had followed Johnson "for between 1 ½ to 3 blocks on public streets into a private parking lot." Id. The defense contends that there is "ample circumstantial evidence for this Court to make a valid inference" that Johnson was aware that he was being followed and that, based on Officer Gilbert's testimony, it is clear that Gilbert believed that Johnson was aware that the officers were following him. The defense also contends that the officers "effectively blocked Mr. Johnson from leaving the parking lot either in his vehicle or on foot," as a result of the positioning of the police car and the positioning of the officers near Johnson, and it notes that, in United States v. Jones, 678 F.3d 293, 300 (4th Cir. 2012), the Court of Appeals explained that the officer "effectively blocked" Jones's vehicle. Id. at 4 & 15 (quoting Jones). Moreover, in Johnson's view, intimidation occurred because the questioning by Officer Gilbert began immediately upon the officers pulling into the lot and, as he sees the record, parking as close to Johnson as they could get. Id. at 19. In sum, "the conduct of the officers amounted to more than 'mere questioning' alone, and any reasonable person would not have felt free to leave under the totality of the circumstances." Id. at 13.

The United States argues that this was a consensual encounter that did not implicate the Fourth Amendment. The

United States also argues that, "well before the encounter escalated into a seizure," the police developed probable cause to arrest Johnson for traffic violations. Govt.'s Supp. Response (Docket No. 37) at 2.[3]

Johnson takes the view that the encounter began when the officers began to follow him on North 23rd Street (Docket No. 34, at 14), but he never specifies when he thinks that the encounter between him and the police became a seizure. Instead, he describes various events commencing with the time that the police car and the Volvo crossed paths and ending with Johnson's flight from the site of questioning. That period, according to the defendant's briefs, seem to circumscribe the seizure that is condemned as violative of the Fourth Amendment because, during that time, a reasonable person would not have felt free to terminate the encounter and go about his business. With that in mind, the facts will be measured against <u>Mendenhall</u> and its progeny and against <u>Jones</u> on which Johnson places principal reliance.

---

[3] The United States also argues that multiple facts, including the high crime area, the lateness of the hour, and Johnson's slouching down and refusal to look at the officers constituted reasonable articulable suspicion that would support an investigatory stop under <u>Terry</u>. It also contends that facts establish probable cause to believe that Johnson had committed one or more offenses in the officers' presence, thus permitting a warrantless arrest. <u>Virginia v. Moore</u>, 553 U.S. 164, 176 (2008); <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001).

Application of the Mendenhall factors shows that the encounter between Johnson and the police did not implicate the Fourth Amendment.   To begin, the record shows that, after the police first came across Johnson, he went one way and the police went another.   It, however, is correct that the police decided to follow Johnson.   But, to do so, the police went around the block and then caught sight of what they thought was Johnson's car.   The police then followed Johnson a very short distance as he turned left onto Clay Street.   Then, a short distance after making that turn, Johnson made an abrupt left turn across the exit side of the entrance into the Jefferson Mews townhomes. Contrary to Johnson's contention, the record does not show that Johnson was aware of the police car when he turned into the Jefferson Mews parking lot and exited the Volvo.   Thus, as a factual matter, the Court finds that Johnson did not know that the police car was behind him.

The encounter continued when the police car parked at the head of the peninsula next to which Johnson had parked the Volvo and as Johnson was crossing the peninsula.   At that time, Officer Gilbert began his conversation with Johnson by asking if Johnson was "okay" and if his "license was okay."   Although there were four officers inside the car, there is no basis on which to infer that Johnson was aware of the two officers in the rear seat during his early exchanges with Officer Gilbert.   The

officers were in uniform, but they did not pull their weapons, turn on the emergency lights of the vehicle, or touch Johnson. They did not park the vehicle in a way that blocked Johnson's car, and there is nothing to indicate that they used an intimidating tone of voice. Nor did Officers Gaines and Moore block Johnson's paths of walking egress, a fact shown clearly by his ability to flee and get a considerable start on Officers Gaines and Moore. The tone of conversation was, apparently, quite conversational and casual. Although Officer Gilbert requested identification information, Johnson was questioned about identification a second time only when it became clear that he had given a false name and social security number when first asked.

Johnson relies principally on the decision in United States v. Jones, 678 F.3d 293 (4th Cir. 2012), arguing that the facts here are the same as in Jones. There are some similarities between Jones and this case. In both cases, the officers were members of a Focus Mission Team. Both Jones and Johnson were driving in what could be called a high crime area[4] and were

---

[4] Although one house at the initial intersection of Venable and Jessamine Streets was known for drug distribution, no one identified the Jefferson Mews townhomes as a high crime area. Hrg. Tr. at 71-73. Here, however, the "high crime area" factor plays no role in the legal analysis. Here, the fact that the house on the corner was known as a site for drug distribution was one of the factors that raised Officer Gilbert's suspicions, but that fact played no role in the encounter.

followed by the police into a private parking lot.  The defense argues that this fact controls the analysis because it transforms a random citizen-police encounter into "one targeted at [the defendant]," relying on Jones, 678 F.3d at 301. Neither Jones nor Johnson had committed any observed traffic violation or other offense at the time the encounter began, except that Officer Gilbert testified that Johnson "cut sharply" when he went into the parking lot on the exit side of the entrance which could have given rise to a citation for a traffic infraction. Hrg. Tr. 93-96.

Both Jones and Johnson were questioned by one or more officers immediately after exiting the vehicle each was driving. In both cases, the United States contends that the questioning officer's tone of voice was conversational and not intimidating, and the officers in both cases testified that they were trying to ensure that the encounter was consensual.  Officer Gilbert stated several times that he was trying "to keep it as consensual as I could." Hrg. Tr. 94:19; 96:5; 102:2-3; 103:17; 105:1-2; 115:15-16.  In the Jones case, Det. Aeschlimann also testified that he tried "to make things what we term a consensual encounter" by pulling past where Jones had parked "leaving [Jones's] vehicle unobstructed to back out of the parking spot if that's something that he chose to do," 678 F.3d

at 297, although Aeschlimann also admitted that the police car "obstructed [Jones] from leaving the driveway." Id.

In both cases, the officers were driving marked cruisers, they were in some type of uniform, they were armed, and they did not activate their emergency lights. In Jones, there were four occupants in Jones' vehicle and only two officers. In this case, Johnson was alone in the Volvo but there were four officers. The encounter in this case took place close to midnight in a small, dark parking lot, which, says Johnson, makes the encounter more intimidating, while the encounter in Jones took place in a parking lot at about 7:00 p.m. in August.

There are key differences in the cases, however. In Jones, Det. Aeschlimann immediately asked Jones and his companion to lift their shirts and asked if he could do a quick pat down for weapons. Jones and his companion complied with both requests. No such request for a pat down occurred in this case. In the Jones case, Aeschlimann then asked Jones for identification. In this case, Gilbert asked Johnson for identifying information only after Johnson stated that he did not have his license on him.

And, unlike Johnson, Jones testified at the evidentiary hearing in his case that he "saw the officers turn their marked patrol cruiser around to follow his car, pulling in behind it on a public roadway, and following it onto private property." 678

F.3d at 300.   The Court of Appeals concluded that, therefore, the encounter in Jones "began with a citizen knowing that the police officers were conspicuously following him, rather than a citizen, previously unaware of the police, being approached by officers seemingly at random." Id. (emphasis in original).   In this case, there was no such testimony from Johnson, and Johnson's conduct upon exiting the Volvo and walking toward the townhomes gave no indication that he was aware of the presence of the police then or while the police car squared the block and subsequently located the Volvo.   Indeed, while the police car squared the block, Johnson could not have seen it.   Nor is there any indication that, after the police car started traveling behind Johnson, he was aware of its presence.

Thus, the record here shows, and the Court finds, as a fact, that Johnson was not aware of the police car until after he exited the Volvo and Gilbert started talking to him as Johnson was walking across the peninsula next to where he had left the parked car.   Thus, this case is, in respect of the knowledge of police presence, quite unlike Jones.

The Court of Appeals also concluded in Jones that the officers "pulled the police cruiser to a stop in the lane of traffic [in the parking lot] and parked there, effectively blocking Jones from moving his vehicle." 678 F.3d at 300.   That was a critical component of the finding that Jones was seized.

25

Here, the record shows, and the Court finds, that Johnson's vehicle was not blocked and that he could have gotten into the Volvo and exited the parking lot.

The finding that Johnson's route of vehicular egress was not blocked and that he could have driven the Volvo out of the parking lot is based on the entirely credible testimony of the police officers, the measurements of distances in the parking area that are in the record, the evidence about the size of the police car and the Volvo, and a view of the scene conducted with counsel for each side present. The Court finds that, at least until it appeared that Johnson was driving without a license, a reasonable person, including Johnson, could have returned to the Volvo, backed out of the parking space, and exited the parking lot at the Jefferson Avenue exit (opposite the end of the lot at which he had entered) or turned around the median and exited through the entrance through which he had entered the parking lot, neither of which was blocked in any way.

On the record, taken as a whole, the Court finds that there was no seizure of Johnson until well after the police had probable cause to arrest him for several offenses other than those charged in the indictment herein. "Warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution." Virginia v. Moore, 553 U.S. 164, 176 (2008). "If an officer has probable cause to believe

that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). Probable cause to arrest a suspect is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" Gerstein v. Pugh, 420 U.S. 103, 111 (1975)(quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). The analysis is based on the court's objective review of the surrounding facts and circumstances, not the subjective intent of the officer as he viewed them at the time of the arrest. Whren v. United States, 517 U.S. 806, 813 (1996). Here, the facts and circumstances demonstrate that there was probable cause that: (1) Johnson had driven recklessly, in violation of Va. Code Ann. § 46.2-852; (2) Johnson had driven without a license, in violation of Va. Code Ann. § 46.2-104; (3) Johnson had given the officers false information, in violation of Va. Code Ann. § 18.2-186.3; and (4) Johnson had possessed an open container of alcohol in the Volvo, which, under certain circumstances, creates a rebuttable presumption that the driver has consumed an alcoholic beverage in violation of Va. Code Ann. § 18.2-323.1.

## CONCLUSION

For the reasons set forth herein, the MOTION TO SUPPRESS (Docket No. 15) is denied.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  October 15, 2014